A91A0226. WHISENANT v. FULTON FEDERAL SAVINGS & LOAN ASSOCIATION OF ATLANTA.
(406 SE2d 793)

BANKE, Presiding Judge.

The appellant sued the appellee seeking damages for the latter's alleged breach of a contractual commitment to make a residential mortgage loan to him on certain specified terms. He also sought damages under the Georgia Fair Business Practices Act, OCGA § 10-1-390 et seq., based on allegations that the appellee had engaged in the unfair and deceptive trade practice of soliciting residential mortgage applications from the public through the offer of interest rate commitments (referred to as "lock-ins") which it had no intention of honoring in the event market interest rates rose pending final approval of the applications. The case is before us on appeal from an order granting summary judgment to the appellee on claims.

The appellant is the president of a real estate development firm and has previous employment experience in commercial banking. In early 1987, he undertook to refinance the mortgage loan on his personal residence, which he had purchased in November of 1985 for $795,000. Prior to contacting the appellee, he had already submitted an application for such refinancing to another lender, Citicorp. However, Citicorp was not willing to commit, or "lock-in," to a fixed interest rate pending approval of the loan. The appellee was willing to do so, and because market interest rates were rising at the time, the appellant considered this willingness to be of substantial potential benefit.

On April 1, 1987, the appellant spoke by telephone with Brad

Driver, a loan originator employed by the appellee, and discussed applying for a mortgage loan in the amount of $675,000. Driver orally agreed at that time to a 45-day "lock-in" at an annual interest rate of 9.5 percent; and on April 7, 1987, the two men met to fill out the necessary application documents. The application was signed by both of them and contained the following provision, which both initialed: "If the 45-day lock-in period expires, the interest and discount points may be subject to change to the prevailing market rate quoted by [the appellee]." The application was predated April 1, 1987, and specified that the "lock-in" period would expire on May 16, 1987.

The appellee's normal fee for such a loan application would have been $265, consisting of a $225 appraisal fee and a $40 credit report fee. However, because the appellant had recently applied to Citicorp to refinance the mortgage and had paid Citicorp for an appraisal of his home in connection with that application, and because that appraisal had been performed by an appraiser (Daniel Karski) who was also on the appellee's list of approved appraisers, the appellee agreed to use the Karski appraisal and accordingly charged the appellant only the $40 fee for the credit report.

It was the appellee's policy to require a 60 percent debt-equity ratio on residential real estate loans, meaning that it would not approve such a loan for more than 60 percent of the appraised value of the real estate. Since the appellant was seeking to borrow $675,000, this meant that the appraised value of the property would have to be at least $1,125,000 in order for the loan to be approved. Coincidentally, this was precisely the value arrived at by Karski in the appraisal he had performed for Citicorp.

The loan committee did not meet on the application until May 19, 1987, which was three days after the "lock-in" expiration date specified on the application. Because market interest rates had continued to rise since the date of the application, the appellant had previously expressed concern to Driver about the possibility that the loan might not be approved by the deadline. The latter had responded by assuring him that so long as the loan committee approved the loan on the terms specified in the application, the appellee "would extend his lock-in date through the closing date. . . ." However, the loan committee did not approve the loan on the terms set forth in the application, for the stated reason that it found the Karski appraisal to be unacceptable "due to location and the fact that the closest comparable was 17 miles away." Instead, the committee approved an adjustable rate loan to the appellant, in an amount equal to 60 percent of value based on an "acceptable appraisal." The appellant alleges that the appellee's failure to approve the loan on the terms specified in the application was not prompted by a good-faith concern over the validity of Karski's appraisal but by a desire to avoid honoring its "lock-

in" commitment during a period of rising market interest rates. *Held*:

1. "It is a well-recognized principle of contract law 'that both parties are under an implied duty of good faith in carrying out the mutual promises of their contract.' [Cits.] A duty of good faith and fair dealing is implied in all contracts in this state. [Cit.] Thus, 'whenever the cooperation of the promisee is necessary for the performance of the promise, there is a condition implied that the cooperation will be given.' [Cit.] However, it is equally settled that 'there "can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do." ' [Cit.]" *Southern Business Machines &c. v. Norwest Fin. Leasing*, 194 Ga. App. 253, 256 (390 SE2d 402) (1990).

For purposes of this appeal, we shall assume that the appellant's payment of the $40 credit report fee at the time he signed the loan application constituted sufficient consideration to impose upon the appellee a contractual obligation to exercise good faith in processing the application, such that it would have been contractually obligated to make the loan on the terms set forth in the application in the event (1) it was reasonably possible to verify the information set forth in the application before the expiration of the "lock-in" period and (2) the loan qualified for approval under its existing underwriting standards. However, even given these assumptions, we conclude that the appellee was properly awarded summary judgment, since the evidence of record conclusively demonstrates that the reason the appellee gave for disapproving the loan on the terms applied for — i.e., its professed concern over the validity of Karski's appraisal — was bona fide.

The appellee's chief appraiser, who was also a member of the loan committee, testified that prior to the loan committee meeting at which the appellant's application was considered, his assistant had called him to say that "he thought we had a problem" with the Karski appraisal in that the property was "a million-plus house north of Alpharetta, almost to the Forsyth County line," and he (the assistant) "didn't recall any houses of that class being in that area." The chief appraiser stated that he thereafter reviewed the appraisal himself and drove out to the house, and that when the loan committee met he told the other members that he "thought the house, while it was a very nice house, it was a mansion, . . . had been overappraised because it [was] grossly overbuilt for the area." He testified that he advised the committee that "in [his] opinion . . . [the] loan . . . should be based on a value of not more than $850,000 reflecting a penalty [of approximately 25 percent] for overbuilding."

We have been cited to no evidence in the record which would support an inference that this opinion was not rendered in good faith or that it was not the actual reason for the loan committee's refusal to

approve the loan on the terms set forth in the application. Indeed, Karski himself acknowledged that there was considerable room for disagreement in valuing properties of this nature and testified that while he would consider a valuation of $850,000 to be unreasonably low for the property, he would not consider an appraisal of $900,000 unreasonably low. He further testified that only a few days after sending his appraisal report to Citicorp valuing the appellant's property at $1,125,000, he had followed up with a letter stating that, based on information which had recently come to his attention regarding a public landfill which was to be opened in the area, he was reducing his valuation by "somewhere between a hundred and a hundred and fifty thousand dollars."

Had the appellee's loan committee approved a loan to the appellant for the amount applied for but at a higher interest rate, there might be some basis for an inference that it had acted in bad faith in failing to honor its "lock-in" commitment. However, based on the unrefuted evidence of record showing that it was genuine concern over whether the value of the property was sufficient to meet the 60 percent debt equity requirement which had in fact caused the application to be disapproved, we hold that the trial court acted properly in granting summary judgment to the appellee on the breach of contract claim.

2. As previously indicated, the appellant's claim for damages under the Fair Business Practices Act was based on the allegation that the appellee had made a practice of soliciting mortgage loan applications from the public by agreeing to interest rate commitments which it did not intend to honor in the event market conditions made it disadvantageous to do so. However, the appellee submitted data indicating that of the 584 residential mortgage loan applications received by it in April and May of 1987, approximately 80 percent had closed and that of those, approximately 93 percent had closed on terms at least as good as those applied for. These statistics, the accuracy of which the appellant has not challenged, clearly tend to negate the appellant's allegation that the appellee was engaged in a "bait and switch" operation. Furthermore, since the evidence of record conclusively demonstrates that the appellant's loan was disapproved for a bone fide reason unrelated to the interest rate commitment, he cannot, in any event, claim to have been injured by the alleged unfair practice. See generally OCGA § 10-1-399 (a); *Zeeman v. Black*, 156 Ga. App. 82 (273 SE2d 910) (1980). Accordingly, even assuming arguendo the applicability of the FBPA to this type of transaction, the trial court also acted properly in granting summary judgment to the appellee on this theory of recovery.

3. The appellant's remaining enumeration of error (which is directed to the court's failure to rule on a pending motion to compel

discovery filed by him) is deemed abandoned pursuant to Court of Appeals Rule 15 (c) (2), due to the appellant's failure to provide supporting argument or citation of authority.

*Judgment affirmed. Carley and Beasley, JJ., concur.*

DECIDED JUNE 11, 1991.

*Davis, Matthews & Quigley, Ron L. Quigley, J. Charles Olderman*, for appellant.

*Cashin, Morton & Mullins, A. L. Mullins, Jr., Swift, Currie, Mc-Ghee & Hiers, Jeffrey Y. Lewis, Jane C. Barwick, Powell, Goldstein, Frazer & Murphy, G. Patrick Watson*, for appellee.